IDAHO POTATO COMMISSION,
Plaintiff,

v.

M & M PRODUCE FARMS & SALES
d/b/a M & M Produce, M & M Packaging, Inc., Matthew Rogowski, Mark
Rogowski, John Doe No 1. Through
Doe No. 100. Defendants.

Hapco Farms, Inc., Plaintiff,

v.

Idaho Potato Commission, Defendant.

Idaho Potato Commission, Plaintiff,

v.

Majestic Produce Corp., Majestic Produce Trucking Corp., Christine Richardson, Rita Strumph, Joseph
Strumph, George Richardson, John
Doe No 1. Through John Doe No. 100,
Defendants.

G & T Terminal Packaging
Co., Inc., Intervenor,

v.

Idaho Potato Commission, Defendant.

Nos. 97 CIV. 8125(CLB), 98
CIV. 0681(CLB) and 98
CIV. 2934(CLB).

United States District Court,
S.D. New York.

April 26, 2000.

David Zaslowsky, Baker & McKenzie,
New York, State of Idaho Attorney General's Office, Boise, ID, for Plaintiff, Idaho
Potato Commission.

M & M Produce Farms & Sales, d/b/a M
& M Produce, M & M Packaging, Inc.,
Matthew Rogowski, Mark Rogowski, Majestic Produce Corp. Majestic Produce
Trucking Corp., Christine Richardson,
Rita Strumph, Joseph Strumph, George
Richardson, for Paintiff Hapco Farms, Inc.

J. Joseph Bainton, Bainton McCarthy &
Siegel, New York City, for Intervenor G &
T Terminal Packaging Co., Inc.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Before this Court for decision is the second motion by the Idaho Potato Commission, represented by the Attorney General of the State of Idaho, for relief under Rule 60(b) of the Federal Rules of Civil Procedure, representing the third attempt by the Idaho Potato Commission (hereinafter the "IPC") to assert Eleventh Amendment immunity.

Familiarity on the part of the reader with this Court's prior decisions, *Idaho Potato Commission v. M & M Produce Farms & Sales*, 35 F.Supp.2d, 313 (S.D.N.Y. January 22, 1999) (First Opinion) denying IPC's motion to dismiss, and this Court's subsequent unreported decision dated August 18, 1999 (Second Opinion) denying the first Rule 60(b) motion is assumed.

The sole issue is whether the IPC enjoys sovereign immunity as an agency created by the Idaho Legislature charged with promoting the sale of Idaho potatoes. The legislative purpose of the IPC is to exercise the power of the State of Idaho in resisting the unlawful branding of other potatoes as Idaho potatoes and protect the quality of Idaho potatoes. In an effort to further this result and to protect the identity and integrity of Idaho potatoes, pursuant to Idaho Code §§ 22–1207(9), the IPC is required to "devise and require the application of either a seal, label brand package or other suitable device that will protect the identity of the original Idaho pack of potatoes as near to the final consumer as possible." In furtherance of this statutory mission, the IPC or the State of Idaho itself, duly registered in the principal register of the United States Patent and Trademark Office the five certification marks described in this Court's First Opinion.

The IPC requires all shippers who buy potatoes in bulk and then repackage them in consumer bags to obtain a license from the Commission and agree to submit to IPC's audit and inspection process. Naturally, this service implicates payment of a fee. The licensing agreements also require the packers to acknowledge that certain of the Idaho marks are valid registered marks, and that they will not during the term of the agreement or at any time thereafter attack the title or any rights of the IPC in and to the relevant Idaho marks. The parties opposing the IPC in this litigation are packers or re-packers of produce (the "Packers"). They seek declaratory and injunctive relief cancelling the Idaho marks under federal and state law, and compensatory and treble damages for three claims of anti-trust violations by IPC.

In its original motion to dismiss, the IPC argued that as an agency of the state it was immune from suit by the Packers under the Eleventh Amendment and that it was entitled to sovereign immunity from the Packers' counterclaims.

The Packers claimed, and the Court found in its First Opinion that IPC was not entitled to Eleventh Amendment immunity, and that assuming it was, any immunity from Hapco's and G & T's claims for cancellation of the IPC's marks had been abrogated by the Lanham Act as amended by the Trademark Remedy Clarification Act of 1992, 15 U.S.C. § 1122.

Our First Opinion turned essentially on this Court's *Mancuso* analysis of Eleventh Amendment immunity, based upon *Mancuso v. New York State Thruway Authority*, 86 F.3d 289, 292 (2d Cir.1996) *cert. denied* 519 U.S. 992, 117 S.Ct. 481, 136 L.Ed.2d 375 (1996). *Mancuso* jurisprudence allows a state created entity such as IPC to enjoy Eleventh Amendment immunity if it can demonstrate that it is "more like 'an arm of the state' such as an agency, than like 'a municipal corporation or other political subdivision.'" *Mancuso*, 86 F.3d at 292 (quoting *Mt. Healthy School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

In our initial *Mancuso* analysis this Court considered the six factors listed in that case and found that the issue of "whether allowing the entity to be sued in federal court would put the State Treasury at risk and/or whether it would threaten the integrity of the State" to be the most salient factor under *Mancuso* where, as in this case, the remaining five factors are evenly balanced or point in different directions. The Court concluded that the State Treasury of Idaho was not at risk, and denied the motion to dismiss on the ground of Eleventh Amendment immunity.

Idaho took an immediate appeal, but while the appeal was pending returned to this Court for the first Rule 60(b) motion, based on subsequently adopted legislation in the State of Idaho which purported to alter the Court's analysis of the sixth *Mancuso* factor. Prior to the first legislative change of § 22–1210, the statute read in relevant part as follows:

> All expenses incurred by the [IPC] in performing its duties and exercising its powers shall be without liability on the part of the state.

The first legislative change in Idaho Code § 22–1210 read as follows:

> All *contractual* expenses incurred by the [IPC] in performing its duties and exercising its powers shall be without liability on the part of the state. (Emphasis in original)

The IPC then argued that the purpose of the amendment was to make clear that the state was not responsible for the IPC's contractual obligations, but was [by negative implication] liable for its torts. (IPC's memorandum of law in support of motion under Fed.R.Civ.P. 60(b) Doc. No. 147 at p. 3.)

> By its Second Opinion this Court held: By adding the limiting statutory language of "contractual" the Idaho Legislature may have attempted to provide specifically, by negative implication, that the State would be liable for tort expenses incurred by the IPC. A declara-

tion of intent alone, either by negative implication or an express provision is not an issue when analyzing the sixth *Mancuso* factor—"[w]hether the entities' obligations are binding upon the state." (Citation omitted)

As this Court held and the IPC acknowledges, at issue is "whether a judgment against the IPC will place the State Treasury at risk," and that issue is determinative of this branch of the motion. This Court rejected the contention that the first legislative change placed the State Treasury at risk for tort claims and therefore denied the first Rule 60(b) motion. This Court also held that the amendment did not affect the procedure by which the State of Idaho provides for payment of IPC's tort liabilities. Tort liabilities of the IPC are satisfied only by the State of Idaho's Mandatory Risk Management Program or "Retained Risk Account" established pursuant to Idaho Code § 67–5776 and administered by the Idaho Department of Administration, Division of Insurance Management, Bureau of Risk Management. This Court held that claims against the Retained Risk Account are not claims against the general Treasury of the State, and therefore the Treasury itself would not be at risk within the meaning of the sixth *Mancuso* factor.

IPC reinstated its appeal and at the same time returned to the State Legislature. The State Legislature passed a further revision to the statute, which clearly was directed primarily to this litigation. By House Bill 452, approved by the Governor on March 3, 2000, the Idaho Legislature enacted a further amendment to § 22–1210 so as to add at the end of first paragraph of the statute the following new words:

> All tort obligations arising out of acts and omissions of the commission are binding on the State of Idaho as, and to the extent provided for, in Chapter 9, Title 6, Idaho Code.

The Bill contained a statement of purpose to the effect that the legislation clarifies existing law, and provided the following information:

This legislation was submitted to the federal district court which has been hearing the case IPC brought against several companies accused of putting non-Idaho potatoes in Idaho potato bags. These same companies have sued the IPC claiming that IPC has damaged them by requiring them to enter into agreements and keep records to prove that they are honest packers of Idaho® potatoes. The Judge ruled that last years legislation was not clear enough stating: "The Idaho Legislature could have dealt directly with the sixth *Mancuso* factor simply by providing that all the obligations of the IPC are binding on the State, and it may yet do so. As of the present date it has not." IPC has appealed this determination to the Second Circuit Court of Appeals.

In October, 1999 the case was put on hold [by the Court of Appeals] in order to give the Idaho legislature the opportunity to clarify the law by putting the uncodified language previously adopted into the statute. This is what section one of this legislation accomplishes.

The legislation also includes an emergency clause because the law is not being changed but merely being clarified. This will allow the litigation to proceed forward without further delay. The emergency clause also makes the legislation retroactive to January 1, 1993. This is necessary to cover the period of time relevant to the court proceedings.

As if this were not a sufficient statement of legislative intent to assert Eleventh Amendment immunity to the fullest extent available under the Constitution, the Governor expressed his own views under date of March 3, 2000 in his letter of transmittal to the Secretary of State, as follows:

\* \* \* \* \* \*

I am deeply committed to preserving Idaho's state sovereignty from encroachment by the federal government. I am also firmly opposed to our state being subjected to suit in federal courts against our will.

This legislation affirms a unified position consistently advanced by the State of Idaho in response to out of state interests who have sued the Idaho Potato Commission, an agency of the government of the State of Idaho. Throughout the litigation, the Attorney General has continually sought the dismissal of these suits on the basis that the Eleventh Amendment to the United States Constitution protects the Idaho Potato Commission from federal jurisdiction. With the assistance and cooperation of the Idaho Legislature and Attorney General, the State of Idaho has, through this legislation, unequivocally expressed our belief that the law of sovereign immunity is applicable in this case.

The United States Supreme Court recently observed that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent...." *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627, 119 S.Ct. 2199, 2204, 144 L.Ed.2d 575 (1999)(quoting The Federalist No. 81). The State of Idaho believes that the essence of sovereignty is the right of the sovereign to choose, subject to constitutional restraints, when, where, how and for what and for what amount it is subject to suit. Idaho has provided by statute, as expressly stated in the Idaho Tort Claims Act, what these limitations are. By law, the retained risk account in the state treasury is the State of Idaho's fund for payment of tort losses for which the state is legally liable. As with all other state agencies, tort obligations of the Idaho Potato Commission are administered by and paid by the Bureau of Risk Management, and are binding on the State of Idaho itself.

The Idaho Supreme Court has affirmed these principles in holding that the State

of Idaho, the Bureau of Risk Management and state agencies represent "one economic family." Because the State required its agencies to remit a portion of their funds to the Bureau of Risk Management, it is "actually the state who is funding the retained risk account, and it is the State which bears the ultimate economic burden of loss" for which the State is liable. *State of Idaho v. Continental Casualty Co.,* 126 Idaho 178, 185, 879 P.2d 1111 (1994).

My signature on House Bill 452 sends a clear message that Idaho will not accept that one of the state's important agencies can be involuntarily subjected to jurisdiction of the federal courts in violation of the Eleventh Amendment to the United States Constitution. This state has authorized and directed the Idaho Potato Commission to combat the counterfeiting activities of those who would illegally infringe upon the trade and certification marks owned by the people of Idaho. The statute further clarifies and reaffirms that our state will not tolerate the substitution of inferior potatoes where genuine Idaho® potatoes are represented as being sold.

&ast; &ast; &ast; &ast; &ast; &ast;

This expression of intent is unmistakable and this Court believes that the Supreme Court of Idaho would now find, notwithstanding this Court's prior *Mancuso* analysis, the IPC is an arm of the State. This Court had concluded previously that the so-called Retained Risk Account was nothing more than an agency funded self-insurance fund, which does not affect the State Treasury absent a voluntary act of the Idaho State Legislature to appropriate money to cover any deficit in that account. This argument remains alive following this most recent legislative *coup de grace* aimed at this litigation. It appears appropriate that this Court re-examine its position on this particular issue.

The Idaho Supreme Court has held that the Bureau of Risk Management, the various state agencies and the general Treasury of the State are "one economic family," whatever that means, and that "it is the State that bears the ultimate economic burden of loss." *State v. Continental Casualty Company,* 126 Idaho, 178, 185, 879 P.2d 1111, 1118 (1994). The Retained Risk Account is treated as a reserve within the State Treasury from which the State pays losses for which the State would be ultimately liable. This Court has considered in the past that if the Retained Risk Account were exhausted by reason of judgments recovered against the IPC and other State agencies similarly situated, the general Treasury of the State would incur no liability by reason of a judgment against the IPC absent the voluntary act of the Idaho Legislature in appropriating funds to make good the hypothetical deficit in the Retained Risk Account. We are now told by the Attorney General that this argument is invalid, and also lacks practicality because the Retained Risk Account is funded by all agencies and offices of the State of Idaho, each of which must pay a portion of the costs of the Bureau of Risk Management as apportioned by the Bureau to that agency or office, and for those reasons no judgment would ever be returned unsatisfied.

This Court, on reconsideration, should and does accept the Supreme Court of Idaho's analysis of what the Retained Risk Account really is. As the Attorney General argues, "[w]hile IPC does not dispute that the Retained Risk Account in the State Treasury is distinct from the General Fund, that does not mean that the Retained Risk Account is not in the State Treasury or that payments from it do not implicate the Eleventh Amendment." He argues further that if judgments calling for payment from a State Treasury's dedicated funds do not implicate the Eleventh Amendment, "every state that specifically established a [judgment] fund other than the general fund within its state treasury would lose its Eleventh Amendment immunity for judgments against that fund."

This Court believes there is much force in that argument and concludes that State Treasury money should be treated as State Treasury money for purposes of *Mancuso* analysis even if it is held and managed in a dedicated fund devoted to tort obligations, rather than as part of a general fund devoted to the payment of official salaries and like expenses. See *Houghton v. Board of Regents of University of Washington,* 691 F.Supp. 800, 803–804 (S.D.N.Y.1988) (Washington state tort claims revolving fund, immunity upheld); *Daniel v. American Board of Emergency Medicine* 988 F.Supp. 127, 177–178 (W.D.N.Y.1997) (New Mexico Risk Management Division of General Services Department responsible to pay claim, immunity upheld.)

This Court recognizes that the Eleventh Amendment retains its full vitality. Indeed, the Eleventh Amendment seems to be in a state of recovery from prior limiting decisions by Federalist-minded judges cutting down its scope. We note that in *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636, decided June 23, 1999, a case resolved after this Court's initial decision in this case, the Supreme Court held that Congress did not have the power to subject non-consenting states to private suits for damages in *state court* where the claim was founded on the federal Fair Labor Standards Act. In *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court overruled its decision in *Pennsylvania v. Union Gas Company,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), emphasizing and reinstating its prior doctrine that in order to abrogate the sovereign immunity of the states Congress must express its intent "unequivocally" and must act pursuant to a valid exercise of power to be found in express provisions of the Constitution as amended. *Seminole Tribe* also reiterated the Supreme Court's long held doctrine that "the relief sought by a plaintiff suing a State is irrelevant to the question of whether the suit is barred by the Eleventh Amendment," and that

the Eleventh Amendment does not exist *solely* in order to prevent federal court judgments that must be paid out of the State's treasury. *Seminole Tribe,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (citing *Hess v. Port Authority Trans–Hudson Corporation,* 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)).

Last, but not least, the Court notes that the Supreme Court has found Eleventh Amendment immunity for states in actions brought pursuant to the unfair competition provisions of the Trademark Remedy Clarification Act. In *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605, decided by the Supreme Court on June 23, 1999, after this Court's First Opinion, the Supreme Court held that so much of the Trademark Remedy Clarification Act, which purported to subject the states to suits brought under § 43(a) of the Lanham Act for false and misleading advertising, was not effective to abrogate Florida's sovereign immunity under the Eleventh Amendment, where an agency of the State of Florida violated the Lanham Act by making misstatements about its own tuition savings plans in its brochures and annual reports, to the detriment of Plaintiff's competing CollegeSure plan. In doing so, the Supreme Court overruled and repudiated its prior determination in *Parden v. Terminal Railway of Alabama State Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), which held that the employee of a state operated railroad might sue under the Federal Employers' Liability Act, 45 U.S.C. § 51–60, because operating a railroad in interstate commerce was an implied waiver of Eleventh Amendment immunity. *See Also Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)(Eleventh Amendment immunity for state infringers of patents).

Because of the most recent Idaho statute, and in light of the current trend of Supreme Court jurisprudence on the subject of Eleventh Amendment immunity, this Court concludes that the IPC's second motion under Rule 60(b) F.R.Civ.P. has merit and must be granted. We note that as to the cases where the IPC is plaintiff, this Court's conclusion remains unaffected, that a state waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts. This principle was reaffirmed in *College Savings Bank, supra* at 119 S.Ct. 2228, n. 3 and again at 2226. See also *Gunter v. Atlantic Coast Line R.R.,* 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906), cited with approval in *College Savings Bank.*

## CONCLUSION

The Court grants the motion to the extent that it severs and dismisses the action initially filed under 98 Civ. 0681 and the claims of Intervenor G & T Terminal Packaging Co., Inc. The Court retains jurisdiction of the cases filed originally under Docket Nos. 97 Civ. 8125 and 98 Civ. 2934 in which the IPC sued as plaintiff and thereby waived its immunity. Whether these cases may be voluntarily discontinued by the IPC in light of the newly enacted statute of March 3, 2000, is not an issue presently before this Court for consideration. By a consent order issued and filed in the Court of Appeals under Court of Appeals Docket Nos. 99–7206 and 9116 on April 18, 2000, it was provided that "the above entitled appeals are hereby withdrawn from active consideration by the Court, such withdrawal to be without prejudice to the reinstatement of the appeal by Appellant's counsel so notifying the Clerk in writing by June 9, 2000. If not thus reinstated, the appeal shall be deemed withdrawn with prejudice. Withdrawal of the appeal from active consideration shall not operate as a dismissal of the appeal under FRAP 42(b)"

Following June 9, 2000 or upon receipt of a further Mandate issued by the Court of Appeals, this court will conduct a case management conference on notice for the purpose of making such directions in those cases in which the IPC is plaintiff, as may be appropriate.

The Clerk shall enter a final judgment severing and dismissing the case in which the IPC appears solely as a defendant, and the claim of the Intervenor G & T Terminal Packing Company.

SO ORDERED.